482-14/MF/PJG
FREEHILL HOGAN & MAHAR, LLP
*Attorneys for Plaintiff*
Hapag-Lloyd Aktiengesellschaft
80 Pine Street
New York, NY  10005
(212) 425-1900 / (212) 425-1901 (Fax)
Peter J. Gutowski, Esq.
Michael Fernandez, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HAPAG-LLOYD AKTIENGESELLSCHAFT,

                                        Plaintiff,

        -against-

O.W. BUNKER NORTH AMERICA, INC., O.W.
BUNKER GERMANY GMBH, O.W. BUNKER USA,
INC., ING BANK N.V.

                                        Defendants.

---

15 Civ. _____

**COMPLAINT FOR
INTERPLEADER**

        Plaintiff Hapag-Lloyd Aktiengesellschaft, by its attorneys Freehill Hogan & Mahar LLP,

files its Complaint for Interpleader pursuant to 28 U.S.C. §§1335 and 2361 against O.W. Bunker

North America, Inc., O.W. Bunker Germany GmbH, O.W. Bunker USA, Inc., and ING Bank

N.V., and respectfully alleges upon information and belief as follows:

                            THE PARTIES

        1.      Plaintiff Hapag-Lloyd Aktiengesellschaft (hereinafter "HLAG") is an entity

organized and existing under the laws of a foreign country with its principal place of business at

Ballindaum 25, D-20095 Hamburg, Germany.

427785.1

2.      Defendant O.W. Bunker North America, Inc. (hereinafter "OW North America") is an entity organized and existing under the laws of Connecticut with its principal place of business at Two Stamford Plaza, 15th Floor, 281 Tresser Boulevard, Stamford, CT 06901.

3.      Defendant O.W. Bunker Germany GmbH (hereinafter "OW Germany") is an entity organized and existing under the laws of a foreign country with its principal place of business at Neumühlen 11, 22763 Hamburg, Germany.

4.      Defendant O.W. Bunker USA, Inc. (hereinafter "OW USA") is an entity organized and existing under the laws of a Texas with its principal place of business at 2603 Augusta Dr., Suite 440, Houston, Texas 77057.

5.      Defendant ING Bank N.V. (hereinafter "ING") is an entity organized and existing under the laws of a foreign country with its principal place of business at Amsterdam Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands, and does business in this jurisdiction.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333, and this action involves an admiralty and maritime claims under Fed. R. Civ. P. 9(h), inasmuch as this action involves competing claims to the payment for marine bunkers provided to the M/V BOX TRADER, an ocean-going vessel time chartered and/or operated by HLAG.

7.      This Court also has jurisdiction over this interpleader action pursuant to 28 U.S.C. §1335 in that: a) at least two of the claimants are of diverse citizenship; b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and c) HLAG is the stakeholder of the funds and is prepared to file the bond required by §1335, covering amounts claimed against HLAG as more particularly described below.

427785.1

8.      This Court has personal jurisdiction over Defendant OW North America pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure.  Additionally, this Court has jurisdiction over OW North America pursuant to the OW Bunker Group Terms and Conditions of sale for Marine Bunkers (hereinafter "OW Terms and Conditions"), a copy of which is attached hereto as **Exhibit 1.**

9.      This Court has personal jurisdiction over Defendant OW Germany pursuant to the OW Terms and Conditions. (**Exhibit 1**).   Additionally, OW Germany continuously and systematically conducts business and/or transacts business in the United States as to the supply of marine bunkers to vessels for purposes of jurisdiction under Fed R. Civ. P. 4(k).

10.     This Court has personal jurisdiction over Defendant OW USA pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure.  Additionally, this Court has jurisdiction over OW USA pursuant to the OW Terms and Conditions. (**Exhibit 1**).

11.     This Court has personal jurisdiction over Defendant ING to the extent that it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute, and to the extent that it is an alleged assignee of the receivables of OW Germany, OW North America, and/or OW USA. Alternatively, this Court has personal jurisdiction over ING pursuant to New York CPLR §301 as ING is engaged in continuous and systematic business within the State of New York through its New York subsidiary at 1325 Avenue of the Americas, New York, New York 10019.

12.     Venue is proper in this District under 28 U.S.C. §1397 and/or the OW Terms and Conditions. (**Exhibit 1**).

427785.1

## Factual Background

13.     HLAG is the time charterer/operator of the M/V BOX TRADER ("the Vessel"), and had all obligations with respect to the purchase and payment for the supply of bunkers to the Vessel.

14.     On or about January 1, 2014, HLAG contracted with OW Germany for the supply of marine bunkers ("bunkers") to vessels during the contract term of January 1, 2014, to December 31, 2014. A copy of the contract between HLAG and OW Germany, (hereinafter "HLAG Marine Fuel Contract"), is attached hereto as **Exhibit 2**.

15.     Thereafter, HLAG placed orders with OW Germany for the delivery of bunkers to, *inter alia*, the Vessel.

16.     In the normal course of business, HLAG would remit payment to OW Germany for bunkers supplied under the HLAG Marine Fuel Contract. (**Exhibit 2**). Whatever payment arrangements may have existed downstream of OW Germany to its affiliates and/or subcontractors were unknown to HLAG.

17.     In or about late October 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the Vessel, and bunkers were provided at the Port of Los Angeles, California, ostensibly by OW North America.   (Copies of the relevant purchase, sale and delivery documents are attached hereto as **Exhibit 3**.)

18.     HLAG has been invoiced $486,756.38 by OW Germany for the bunkers supplied to the Vessel.

19.     OW North America has presumably invoiced either OW Germany and/or OW USA for the bunkers supplied to the Vessel, but has presumably not been paid and has therefore demanded that HLAG remit payment directly to OW North America and/or OW USA.

4

20.     HLAG has made no payment with respect to the supply of bunkers to the Vessel, and competing claims have been or may be made by Defendants against HLAG and/or the Vessel asserting entitlement to the payment from HLAG.  Threats have also been made to arrest the Vessel.

### CAUSE OF ACTION - INTERPLEADER WITH RESPECT TO THE M/V BOX TRADER

21.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-20, inclusive, as if fully set forth at length herein.

22.     There are various competing interests for the amounts due and owing by HLAG for the bunkers supplied to the Vessel, including but not limited to claims by OW Germany, OW North America, OW USA, and/or ING.

23.     HLAG is unsure of which party to pay for the bunkers supplied to the Vessel and accordingly has not made any payments to anyone in response to the competing demands.

24.     Based on the foregoing, HLAG, a disinterested stakeholder, has been and will be subject to multiple claims for payment for the bunkers supplied to the M/V BOX TRADER, and the interests of the defendants in the property subject to this interpleader are adverse as there is a dispute as to which entity or entities are entitled to payment from HLAG for the bunkers.

25.     HLAG has a reasonable fear of multiple liabilities because of these adverse claims including, but not limited to, the threat of *in rem* seizure of the Vessel or other property owned or operated by HLAG.

26.     In accordance with 28 U.S.C. §1335(a)(1) and 28 U.S.C. §2361, HLAG has or will post a bond covering and securing the indebtedness to the appropriate party (once determined by the Court), and is therefore entitled to relief in the form of: (a) an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for

5

payment for the bunkers supplied; (b) an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to arrest, attachment or other restraint of the Vessel or any other property of HLAG; and (c) ultimately, an order determining the party or entity to which payment should be made and discharging HLAG from any liability after payment (as secured by the bond) is effected to the party or entity so designated by the Court to receive the payment for the supply of the bunkers to the Vessel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HLAG respectfully prays that:

1.      Process in due form be issued to the defendants citing them to appear and answer the complaint, failing which a default can be taken;

2.      Approve the bond tendered by HLAG;

3.      Issue an immediate order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action or proceeding anywhere by the defendants (or any number of them) to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the M/V BOX TRADER or any other property of HLAG or the owners of the Vessel or any other entity within the same management;

4.      Direct the defendants to file their claims for payment related to the supply of bunkers to the Vessel in these proceedings for the Court to adjudicate the proper entity to which payment is due; and

6

5.     Declare, upon such determination and payment, as secured by the bond, that HLAG is discharged from all liability with respect to the supply of the bunkers as to all other parties and entities; and

3.     That HLAG be awarded such other and further relief which this Court may deem just and proper including but not limited to the attorneys fees and costs to which HLAG is entitled under the relevant statutes.

Dated: New York, NY
January 12, 2015

Respectfully Submitted,

Peter J. Gutowski
Michael Fernandez
80 Pine Street
New York, NY  10005
(212) 425-1900 / (212) 425-1901 (Fax)
*Attorneys for Plaintiff,*
*Hapag-Lloyd Aktiengesellschaft*

427785.1

# Exhibit 1

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A.**       **GENERAL INTRODUCTION**

A.1       This is a statement of the terms and conditions according to which the
International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2       These conditions apply to all offers, quotations, orders, agreements, services and all subsequent
contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3       General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4       In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are
invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

**B.**       **DEFINITIONS**

B.1       Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |

**C.**       **OFFERS, QUOTATIONS AND PRICES**

C.1       An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the
GTC are considered a part of the Confirmation.

C.2       Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall
only bind the Seller upon the Sellers' broker or other authorised representative sending the Order
Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3       The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components
for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax,
assessment, duty or other charge of whatever nature and however named, or any increase of
components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement
has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4     All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5     If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6     The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7     If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.


D.      SPECIFICATIONS (QUALITY – QUANTITY)

D.1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
        Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2     The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum.

D.3     Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4     In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.


E.      MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E.1     The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2     The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3     Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4     The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any "No-lien" clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5     In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

## F.     SAMPLING

F.1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing the labels of the sample bottles.

F.2     In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3     The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5     In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those tests results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6     The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7     No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8     Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.        DELIVERY**

G.1        The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2        The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3        The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilots, port- or other authorities.

G.4        In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5        The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6        The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7        If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8        The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9        The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10       The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
           During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
           Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11       In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12       Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13   If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14   The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15   If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16   In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

G.17   For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration. Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18   Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded.

## H.   TITLE

H.1   Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2   Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3   In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4   In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5   The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6   Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7     For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.


I.      **PAYMENT – MARITIME LIEN**

I.1     Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2     Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3     (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5     Any delay in payment of the full sum due shall entitle the Seller to interest at, the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6     Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7     All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8     The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9    Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10   It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.    CLAIMS

J.1    In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2    Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3    The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4    The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5    In each and every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.    LIABILITY – LIMIT TO SELLER'S LIABILITY

K.1    The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2    Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3      The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4      No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.

## L.      EXEMPTIONS AND FORCE MAJEURE

L.1      Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

L.2      If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3      Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3      In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4      (a)      These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

(b)      Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

(i)      A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

(ii)      Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

(ii)      A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

**M.**        **BREACH/CANCELLATION**

M.1        Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

a)        when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

b)        when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

c)        when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

d)        when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2        The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3        The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

a)        The Vessel; or
b)        The Charterer of the Vessel; or
c)        The fully or partly Owner(s) of the Vessel; or
d)        Any officers of the Vessel; or
e)        The Operator and/or Manager of the Vessel; or
f)        Any other person or entity in any way related to the Agreement or delivery is/are
1)        Iranian(s); or
2)        Related in any way to Iran or Iranians; or
3)        Listed on the US OFAC Specially Designated Nationals List; or
4)        Covered by any US, UN- and/or EU sanctions; or
5)        Covered by any sanctions of any other jurisdiction and/or administration.
Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.
The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4        The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act. Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

**N.**        **SPILLAGE, ENVIRONMENTAL PROTECTION**

N.1        If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O.   DELAYS AND CANCELLATIONS

O.1   Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2   If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P.   LAW AND JURISDICTION

P.1   This Agreement shall be governed and construed in accordance with English law.
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2   In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the ''LLMA''). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement. Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3   Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4   In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5   The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6     If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

**Q.       VALIDITY**

Q.1     These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2     These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# Exhibit 2



# ARA - Contract

Seller : OW Bunker Germany GmbH

Buyer : Hapag Lloyd AG, Hamburg

Port of delivery : Antwerp (ANR)
Rotterdam (RTD)

Contract term : January 1st – December 31st 2014

| No. | Product | Antwerp | Rotterdam | Lot size min | Lot Size max | Formula | Rebate / Premium FIXED |
|-----|---------|---------|-----------|--------------|--------------|---------|------------------------|
| 1 | RMG 380, max.3,50% Sulfur | 150.000 | 15.000 | 300 | 5.000 | Low on Platts "FOB RDAM BARGES, 3.5 PCT HSFO" | - 2,00 |
| 2 | RMK 700 or RMK 500 or RMG 380, max. 1,00% sulfur | 25.000 | 35.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 5 | RMK 500 or RMG 380, max. 1,00% sulfur | 50.000 | 10.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 6 | RMG 380, max. 1,00% sulphur | 140.000 | 20.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 7 | DMZ max. 0,10% sulphur or DMA max.0,10% sulphur | 20.000 | 20.000 | 30 | 500 | Low on Platts "FOB RDAM BARGES, GASOIL 0.1% " | - 32,00 |

The above mentioned quantities are indicative and the buyer is allowed to exceed or reduce the quantities along with buyers requirements in the above mentioned ports by +/-20%.

Preplanning : monthly preplanning schedule to be sent in advance (at least 5 days before the end of the month) for the following month

Nomination : minimum 7 working days prior to ETA.

Pricing : 4 working days prior to ETA.

Quality : Antwerp:   ISO 8217:2010 (E)
Rotterdam:   ISO 8217:2010 (E)

Quality guarantee : Seller guarantees a max claim rate of 3% of total supplied volume. In case seller exceed the max claim rate an additional discount of 0.25 usd/mt to apply on all supplied volume. This will be calculated on a quarterly basis. A claim is determined as a supply conducted outside the product specification stated in the contract. Volume differences due to density excluded.



| | |
|---|---|
| Contract KPI's | Each contract will be evaluated on quarterly Quality meetings with participation of the relevant stakeholders from both the buyer and seller |
| Sulphur level<br>Confidence level 97,50% | : 3,50%   1,00%<br>: 3,29%   0,93% |
| Max. CCAI limits | : RMG 380 max. 855<br>RMK 500 max. 870<br>RMK 700 max. 870 |
| Energy | : Specific Energy as per ISO parameters (net calorific energy) of 40.00 MJ/Kg for all Marine Fuel Oils is aimed but not guaranteed (especially for RMK products). |
| Quality | : Seller has to ensure the product delivered is derived from petroleum crude oil and must neither contain: contaminants (i.e. chemical waste, polypropylene, used lubricants, abrasive materials) nor blending components derived from coal and shale distillations processes. In case analysis from legal sample shows any added substances like DCPD, Styrene, Phenol, 1-Butanol, Indene, 1 Phenyl-ethanol seller is fully responsible for all possible consequences including but not limited to direct and indirect damages to the vessel's engine. |
| Sulphur | : LSFO fitted for use in SECA´s. In case first analysis exceeds 1,00 % level, the result of the representative sample, sealed and signed by both parties will be final and binding for all parties. |
| Payment Terms | : 30 days after delivery |
| Max. claim notice period | : 60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL OIL SUPPLIES IN ANTWERP OR ROTTERDAM.<br>30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE |
| Termination period | : 60 days from both sides otherwise till end of 2014 |
| Terms and Conditions | : Hapag Lloyd AG's standard terms and conditions version 2014 to apply.<br>(version 7.11.3849.00 15623934) |
| Non disclosure | : Buyer and seller agrees that it will keep the pricing terms of this contract confidential |

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D- 22763 Hamburg
Phone +49 40 32 55 98 0 · Fax +49 40 33 04 71
Email: hamburg@owbunker.de

_____
Hapag Lloyd AG
(Buyer)

O.W. Bunker Germany GmbH
(Seller)



## *MARINE FUEL OIL TERMS & CONDITIONS OF PURCHASE*

### 1. DEFINITIONS

THROUGHOUT THIS CONTRACT THE FOLLOWING DEFINITIONS SHALL APPLY TO THESE PURCHASE TERMS:

* BUYERS          :          HAPAG- LLOYD AG                          HAPAG-LLOYD
                             BALLINDAMM 25            OR             KREUZFAHRTEN GMBH
                             20095 HAMBURG                           BALLINDAMM 25
                             GERMANY                                 20095 HAMBURG
                                                                     GERMANY

* SELLERS        :          THE CONTRACTING COMPANY FROM WHOM THE BUYERS PURCHASE THE MARINE FUELS.
* SUPPLIERS      :          THE COMPANY FROM WHOM THE SELLERS PROCURE THE SUPPLY OF MARINE FUELS.

* MARINE DESTILLATED OIL AND MARINE FUEL OIL:          AS PER ISO 8217 : LATEST EDITION - INTERNATIONAL
                                                       STANDARD PETROLEUM PRODUCTS - FUELS (CLASS
                                                       F)   WHICH   PROVISIONS   SHALL   BE   DEEMED
                                                       INCORPORATED   HEREIN.   SPECIFICATIONS   OF
                                                       MARINE FUELS AS WELL AS ANY SUBSEQUENT
                                                       AMENDMENTS THEREOF, HEREINAFTER REFERRED
                                                       TO AS "FUEL".

### 2. APPLICATION AND ENTIRE AGREEMENT PROVISIONS

THESE PURCHASE TERMS SHALL APPLY TO ANY PURCHASE CONTRACT BETWEEN THE BUYERS AND THE SELLERS
FOR "FUEL" AND SUPERSEDE ALL PRIOR AGREEMENTS, ARRANGEMENTS, REPRESENTATIONS (AND
MISREPRESENTATIONS) AND STIPULATIONS HOWSOEVER AND WHENSOEVER OCCURRING IN RESPECT OF THE SAME
SUBJECT, WHETHER MADE IN WRITING OR ORALLY AND FUTURE CHANGES TO THESE PURCHASE TERMS MAY ONLY
BE MADE IN WRITING AND MUST BE SIGNED BY BOTH PARTIES.

### 3. APPLICATION OF THE SINGAPORE BUNKERING PROCEDURE (SBP)

WHERE DELIVERY OF "FUEL" IS CARRIED OUT BY BARGES/TANKERS IN SINGAPORE, THE DELIVERY OPERATION
SHALL FOLLOW THE PROCEDURES PRESCRIBED BY THE SINGAPORE BUNKER PROCEDURE LATEST EDITION, ISSUED
BY SINGAPORE NATIONAL SHIPPING ASSOCIATION WHICH PROVISIONS SHALL BE DEEMED INCORPORATED HEREIN.

### 4. DOCUMENTATION

BEFORE COMMENCEMENT OF DELIVERY THE SELLERS SHALL PRESENT FOR ACKNOWLEDGEMENT BY THE MASTER
OF THE VESSEL OR HIS REPRESENTATIVES, A BUNKER REQUISITION OR SIMILAR DOCUMENT, DULY SIGNED BY THE
SELLERS OR THEIR REPRESENTATIVES, WHICH SHALL CONTAIN THE QUANTITIES TO BE DELIVERED AND ALL
INFORMATION REQUIRED IN ACCORDANCE WITH IMO/ISO RECOMMENDATIONS AND SPECIFICATIONS, INCLUDING IN
PARTICULAR,
ACTUAL VALUES FOR:

* VISCOSITY
* DENSITY
* WATER CONTENT
* SULPHUR CONTENT
* FLASHPOINT
* DELIVERY TEMPERATURE
* POUR POINT

IN ADDITION, AND IF AVAILABLE, SIMILAR INFORMATION SHALL BE PROVIDED FOR ALUMINIUM/SILICON,
VANADIUM AND ASH CONTENT.

ONCE THE DELIVERY IS COMPLETED AND QUANTITIES MEASURED, A RECEIPT SHALL BE SIGNED AND STAMPED BY
THE MASTER OF THE VESSEL, AND RETURNED TO THE SELLERS OR HIS REPRESENTATIVES, AS ACKNOWLEDGEMENT
OF THE DELIVERY ONLY AND A DUPLICATE COPY SHALL BE RETAINED BY THE MASTER OF THE VESSEL. THIS
RECEIPT SHALL NOT IN ANY WAY BE CONSTRUED AS ACCEPTANCE BY THE BUYERS OF THE INFORMATION
CONTAINED THEREIN, INCLUDING:

7.11.3549.00 15823934

 

* DELIVERED QUANTITY IN VOLUME UNITS AT ACTUAL TEMPERATURE
* ACTUAL DELIVERY TEMPERATURE
* DELIVERED QUANTITY IN VOLUME AT 15 DEGR. C.
* DENSITY IN KG/CBM AT 15 DEGR. C.
* DELIVERED QUANTITY IN WEIGHT UNITS.
* FLASHPOINT
* SULPHUR CONTENT IN % M/M

## 5. QUANTITY

THE QUANTITY OF "FUEL" DELIVERED SHALL BE DETERMINED BY DIPPING OF TANKS OR METER READING AND CARGO TEMPERATURE READING OF THE BARGES/TANKERS TANKS EFFECTING DELIVERY.
IN CASE DELIVERY WILL TAKE PLACE FROM SHORESIDE THE QUANTITY THEN SHALL BE DETERMINED BY METER READING.
THE SELLERS' FIGURES, HOWEVER, SHALL NOT BE REGARDED AS CONCLUSIVE OR BINDING, AND THE BUYERS SHALL HAVE THE RIGHT TO PROVE THAT THE FIGURES SHOWN IN THE BUNKER DELIVERY RECEIPT ARE INCORRECT.
SELLERS SHALL INVITE BUYERS REPRESENTATIVE TO WITNESS THE DELIVERY PROCEDURE.
THE FINDINGS OBTAINED AND NECESSARY ADJUSTMENTS IN VOLUME SHALL BE CALCULATED IN ACCORDANCE WITH THE ASTM-IP PETROLEUM MEASUREMENT TABLES.
MASTER OR HIS REPRESENTATIVE SHALL SIGN THE BUNKER DELIVERY RECEIPT FOR ACTUAL VOLUME AND ACTUAL DELIVERY TEMPERATURE ONLY, BUT NOT FOR THE DENSITY SHOWN IN THE BUNKER DELIVERY RECEIPT.
MASS IN VACUUM OR WEIGHT IN AIR SHALL BE SUBJECT TO VERIFICATION OF DENSITY OR WEIGHT FACTOR RESPECTIVELY BY ANALYSIS OF VESSEL'S RETAINED SAMPLE.
IF DISCREPANCIES ARISE BETWEEN SUPPLIERS AND BUYERS AS TO QUANTITIES OF "FUEL" SUPPLIED, SUCH DISCREPANCIES SHALL HAVE TO BE DISCUSSED BETWEEN BUYERS AND SELLERS WITH A VIEW TO FINDING A FAIR AND REASONABLE SOLUTION, FAILING WHICH CLAUSE 13 SHALL APPLY.

## 6. QUALITY/GRADE

THE BUYERS SHALL HAVE THE SOLE RESPONSIBILITY FOR THE NOMINATION OF THE GRADES OF MARINE FUEL OIL SUITABLE TO THE VESSEL AND SHALL STATE THE GRADES REQUIRED IN THE NOMINATION ORDER
THE SELLERS WARRANT THAT THE MARINE FUEL OIL SHALL BE OF A HOMOGENEOUS AND STABLE NATURE AND SHALL COMPLY WITH THE ISO GRADE NOMINATED BY THE BUYERS. SELLERS WARRANT, AND BUYERS RELY ON SELLERS' EXPERTISE IN PROVIDING SUCH A WARRANTY, THAT THE FUEL SUPPLIED WILL NOT ONLY MEET THE RELEVANT ISO CRITERIA FOR THE GRADE OF FUEL SUPPLIED BUT WILL ALSO BE FIT AND/OR SUITABLE FOR THE PURPOSE OF PARTICULAR ENGINE INTENDED.
THE MARINE FUEL OIL SHALL IN ALL OTHER RESPECTS COMPLY WITH ISO STANDARDS 8217:2010 AND ANY SUBSEQUENT AMENDMENTS THEREOF.

## 7. DELIVERY

THE "FUEL" SHALL BE DELIVERED TO THE VESSEL EX WHARF OR EX LIGHTER IN THE OPTION OF THE BUYERS OR BUYERS REPRESENTATIVES IN CASE BOTH ALTERNATIVES EXIST.

IF DELIVERY BY BARGE IS REQUESTED, THE SELLERS WILL ARRANGE FOR SUFFICIENT BARGE AND PUMPING CAPACITY FOR TIMELY AND SPEEDY DELIVERY.

THE LIGHTERAGE CHARGE TO BE FOR THE BUYERS ACCOUNT, UNLESS THE PRICES ARE QUOTED FREE DELIVERED TO BUYERS VESSEL.

DELIVERY SHALL BE MADE AT DAY- AND NIGHT-TIME, SUNDAYS AND HOLIDAYS IF NECESSARY AND AS LONG AS ALLOWED BY APPLICABLE LOCAL LAWS OR REGULATIONS.

THE SELLERS SHALL BE IN POSSESSION OF ALL LICENCES, PERMISSIONS, AUTHORISATIONS, CONSENTS AND PERMITS REQUIRED TO COMPLY WITH ALL RELEVANT APPLICABLE LAWS, ENACTMENTS, ORDERS, REGULATIONS AND ALL OTHER INSTRUMENTS RELATING TO THE SUPPLY AND DELIVERY OF MARINE "FUEL" AT THE PORT OR PLACE OF DELIVERY AND SHALL SUBJECT TO LOCAL LAWS PERMITTING, AND BE RESPONSIBLE TO MAKE ALL CONNECTIONS AND DISCONNECTION'S BETWEEN THE DELIVERY HOSE(S) AND THE VESSEL'S INTAKE PIPE AND TO ENSURE THAT THE HOSE(S) ARE PROPERLY SECURED TO THE VESSEL'S MANIFOLD PRIOR TO THE COMMENCEMENT OF DELIVERY.

## 8. BOOMING

BOOMING TO BE ARRANGED BY SELLERS/ SUPPLIERS ACCORDING TO ALL REQUIREMENTS OF ALL APPLICABLE LOCAL LAWS AND REGULATIONS.

7.11.3849.00 15623934



Hapag-Lloyd

**9. SURVEY**

EVERY "FUEL" DELIVERY WILL   BE ATTENDED BY AN INDEPENDENT SURVEY COMPANY APPOINTED BY THE BUYERS.
BUYERS WILL BEAR THE COSTS OF SUCH SURVEY.

**10. SAMPLING**

THE SELLERS SHALL ARRANGE AT LEAST FOR SIX (6) IDENTICAL REPRESENTATIVE SAMPLES OF EACH GRADE OF THE
"FUEL" ( INCLUDING ONE (1) MARPOL SAMPLE) TO BE DRAWN THROUGHOUT THE ENTIRE BUNKERING OPERATION IN
THE PRESENCE OF BOTH THE SUPPLIERS AND THE BUYERS OR THEIR RESPECTIVE REPRESENTATIVES.

THE SAMPLES SHALL BE DRAWN AT A POINT TO BE MUTUALLY AGREED BETWEEN SELLERS/SUPPLIERS AND THE
BUYERS OR THEIR RESPECTIVE AGENTS, CLOSEST TO OR AT (WHERE POSSIBLE) THE VESSEL'S BUNKER MANIFOLD.

THE SAMPLES SHALL BE DRAWN USING A MUTUALLY ACCEPTED SAMPLING DEVICE WHICH SHALL BE
CONSTRUCTED, SECURED AND SEALED IN SUCH A WAY SO AS TO PREVENT THE SAMPLING DEVICE AND THE
SAMPLES BEING TAMPERED WITH THROUGHOUT THE TRANSFER PERIOD.

THE AFOREMENTIONED SAMPLES SHALL BE SECURELY SEALED AND PROVIDED WITH LABELS SHOWING THE
VESSEL'S NAME , IDENTITY OF DELIVERY FACILITY, PRODUCT NAME, DELIVERY DATE AND PLACE AND SUPPLIERS
SEAL NUMBER.

HOWEVER, SAMPLE BOTTLES MUST BE FITTED WITH TWO SEAL LUGS TO ENABLE BUYERS REPRESENTATIVES TO
COUNTERSEAL THE SAMPLES. IN CASE SUPPLIERS CAN NOT PROVIDE SUCH SAMPLE BOTTLES, BUYERS SHALL HAND
OVER SAID BOTTLES TO THE SUPPLIER FREE OF CHARGE UNTIL FURTHER NOTICE.

SUCH SAMPLES SHALL BE DISTRIBUTED AS FOLLOWS:
TWO (2) SAMPLES TO BARGE SUPPLIER, TWO SAMPLES TO ATTENDING SURVEYOR, ONE (1) SAMPLE TO SEAGOING
VESSEL, ONE (1) SAMPLE TO MARPOL.

IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION OR BEYOND BUYERS CONTROL AND/OR WITHOUT AN
INDEPENDENT SURVEY OR AGREED BETWEEN THE SELLERS AND BUYERS BEING PRESENT ARE NOT
REPRESENTATIVE OF THE DESCRIPTION, QUANTITY, QUALITY OR FITNESS FOR PURPOSE OF THE "FUEL". FOR THE
AVOIDANCE OF DOUBT,   SIGNATURES FOR, OR ACCEPTANCE OF THE SAMPLE(S) BY THE VESSEL'S MASTER OR
ANOTHER   VESSEL'S REPRESENTATIVE OR AGENT IN RELATION TO SUCH SAMPLES SHALL NOT MEAN THAT THE
SAMPLES ARE REPRESENTATIVE OF THE "FUEL" SUPPLIED.
BARGE / SUPPLIERS SAMPLES TO BE RETAINED FOR NINETY ( 90 ) DAYS.

**11. PRICE**

THE PRICE OF "FUEL" DELIVERED SHALL BE AS AGREED, AND STATED IN THE BUYERS' PURCHASE ORDER.
ANY DEMURRAGE CHARGES DUE TO BUYERS FAILURE SHALL BE ABSORBED BY THE BUYERS.
ANY DEMURRAGE CHARGES DUE TO SELLER / SUPPLIERS FAILURE SHALL BE ABSORBED BY THE SELLERS /
SUPPLIERS.

**12. PAYMENT**

UNLESS EXPLICITLY AGREED UPON IN WRITING BETWEEN SELLERS AND BUYERS PAYMENT IN US DOLLARS FOR THE
"FUEL" DELIVERED WILL BE AVAILABLE TO THE SELLER'S ACCOUNT WITHIN THIRTY CALENDAR (30) DAYS AFTER
THE COMPLETION OF DELIVERY OR FIFTEEN ( 15) RUNNING CALENDAR DAYS AFTER THE RECEIPT OF THE SELLERS'
INVOICE, WHICHEVER IS THE LATER.

ANY DELAY IN PAYMENT SHALL ENTITLE THE SELLERS TO INTEREST AT THE RATE OF 12% PER ANNUM.
SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN 3 WORKING DAYS AFTER DUE DATE OF
INVOICE

SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN 3 WORKING DAYS AFTER DUE DATE OF
INVOICE.

THE INVOICE HAS TO INCLUDE THE NAME OF THE RECEIVING VESSEL, THE BUNKERING PORT, THE DATE OF
DELIVERY, THE REFERENCE OF THE BUYERS, APART FROM DESCRIPTION OF THE QUANTITY AND QUALITY SUPPLIED.

**13. CLAIMS**

ANY DISPUTE AS TO THE QUANTITY DELIVERED MUST BE NOTED AT THE TIME OF DELIVERY IN THE BUNKER
DELIVERY RECEIPT OR IN THE LETTER OF PROTEST. ANY CLAIM AS TO SHORT DELIVERY SHALL BE PRESENTED BY

7 11.3849 00 15823934

 

THE BUYERS IN WRITING WITHIN 15 CALENDAR DAYS FROM THE DATE OF DELIVERY, FAILING WHICH ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

ANY CLAIM AS TO THE QUALITY OR DESCRIPTION OF THE "FUEL" MUST BE NOTIFIED IN WRITING PROMPTLY AFTER THE CIRCUMSTANCES GIVING RISE TO SUCH CLAIM HAVE BEEN DISCOVERED. IF THE BUYERS DO NOT NOTIFY THE SELLERS OF SUCH CLAIM WITHIN :
60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL OIL SUPPLIES IN ANTWERP OR ROTTERDAM.
30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE,
THEN THOSE CIRCUMSTANCES SHALL BE PRESUMED NOT TO HAVE BEEN CAUSED BY ANY DEFICIENCY IN THE QUALITY OR DESCRIPTION OF THE "FUEL" SUPPLIED AND ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

IN THE EVENT OF A CLAIM AS TO QUALITY AND DESCRIPTION THE PARTIES HERETO SHALL HAVE THE QUALITY OF THE "FUEL" ANALYSED BY A MUTUALLY AGREED, QUALIFIED AND INDEPENDENT LABORATORY. THE SELLERS AND THE BUYERS SHALL PROVIDE THE LABORATORY WITH ONE OF THE SAMPLES RETAINED . IF ISO GRADES HAVE BEEN SPECIFIED THE ANALYSIS SHALL BE ESTABLISHED BY TESTS IN ACCORDANCE STRIKE ISO 8217: LATEST EDITION 10 AND ISO 4259 OR ANY SUBSEQUENT AMENDMENTS THEREOF. UNLESS OTHERWISE AGREED THE EXPENSES OF THE ANALYSES SHALL BE BORNE EQUALLY BY THE SELLERS AND THE BUYERS.

IN THE EVENT OF ANY DELAY RESULTING FROM:
THE BUYERS FAILURE TO GIVE PROPER NOTICES AND/OR THE BUYERS VESSEL FAILING TO RECEIVE "FUEL" AT THE PUMPING RATE

* THE SELLERS FAILURE TO COMMENCE DELIVERY OF THE "FUEL" PROMPTLY IN ACCORDANCE WITH THE BUYERS REQUIRED DELIVERY TIME   AND/OR THE SELLERS FAILURE TO DELIVER THE "FUEL" IN  ACCORDANCE WITH THE MINIMUM HOURLY PUMPING RATE , THEN THE PARTY SUFFERING SUCH A DELAY SHALL BE ENTITLED TO COMPENSATION FROM THE OTHER PARTY FOR THAT DELAY.

14. RISK/TITLE

RISK IN THE MARINE FUEL SHALL PASS TO THE BUYERS ONCE THE "FUEL" HAS PASSED THE FLANGE CONNECTING THE VESSEL'S BUNKER MANIFOLD WITH THE DELIVERY FACILITIES PROVIDED BY THE SELLERS.
TITLE TO THE MARINE FUELS SHALL PASS TO THE BUYERS UPON PAYMENT FOR THE VALUE OF THE MARINE FUELS DELIVERED. UNTIL SUCH PAYMENT HAS BEEN MADE, THE SELLERS SHALL HAVE THE RIGHT OF LIEN OVER THE MARINE FUELS DELIVERED.

15. CANCELLATION

IF THE VESSEL FAILS TO ARRIVE AT THE PLACE OF DELIVERY WITHIN 72 HOURS FROM THE DATE NOMINATED/ESTIMATED TIME OF ARRIVAL AS STATED IN  THE BUYERS' PURCHASE ORDER, EITHER PARTY HAS THE OPTION TO CANCEL THE DELIVERY OF "FUEL" IMMEDIATELY WITHOUT INCURRING ANY LIABILITY WHATSOEVER.

16. FORCE MAJEURE

NEITHER PARTY SHALL BE RESPONSIBLE FOR ANY LOSS, DAMAGE, DELAY OR FAILURE IN PERFORMANCE UNDER THESE TERMS RESULTING FROM THE ACT OF GOD, OR THE PORT OF DELIVERY BEING AFFECTED BY STORMS, FLOODS, WAR, CIVIL COMMOTION, RIOT, FIRE, SABOTAGE, QUARANTINE, STRIKES, STOPPAGES, LOCK-OUTS, ARRESTS, DETAINMENT'S OF KINGS, PRINCES, RULERS AND PEOPLE, ACTS OF TERRORISM OR ANY OTHER EVENT BEYOND THEIR CONTROL  ARISING AFTER AGREEING THESE TERMS WHICH CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE, OR THE CONSEQUENCES OF WHICH, AS MAY AFFECT THE PERFORMANCE OF THESE TERMS   CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE.

17. SAFETY AND THE ENVIRONMENT

IN THE EVENT OF ANY SPILLAGE, WHICH SHALL MEAN ANY LEAKAGE, ESCAPE, SPILLAGE OR OVERFLOW OF THE "FUEL", CAUSING OR LIKELY TO CAUSE POLLUTION OCCURRING AT ANY STAGE OF THE BUNKERING OPERATION, THE BUYERS AND THE SELLERS SHALL JOINTLY, AND REGARDLESS AS TO WHETHER THE BUYERS OR THE SELLERS ARE RESPONSIBLE , IMMEDIATELY TAKE SUCH ACTIONS AS ARE NECESSARY TO EFFECT CLEAN UP AND WHICH SHALL ALWAYS BE CONDUCTED IN ACCORDANCE WITH SUCH LOCAL LAWS AND REGULATIONS WHICH MAY COMPULSORILY APPLY.

WHERE IT IS A COMPULSORY  REQUIREMENT OF THE LAW OF THE PORT OR PLACE OF DELIVERY OF THE "FUEL" THAT THE SELLERS SHALL HAVE IN PLACE THEIR OWN OIL SPILL CONTINGENCY PLANS, THE SELLERS SHALL  ENSURE

7.11.3849.00 15623934

   

THAT VALID OIL SPILL CONTINGENCY PLANS APPROVED BY THE RELEVANT AUTHORITIES ARE IN EFFECT TO THE EXTENT THAT IS SO REQUIRED.

THE SELLERS HEREBY GUARANTEE PAYMENT OF AND/OR AGREE TO INDEMNIFY AND HOLD THE BUYERS HARMLESS FOR ANY CLAIMS, LOSSES, DAMAGES, EXPENSES, PENALTIES OR OTHER LIABILITIES INCURRED BY THE BUYERS UNDER THE UNITED STATES OIL POLLUTION ACT OF 1990, OR OTHER POLLUTION LEGISLATION OF ANY STATE OF THE UNITED STATES OF AMERICA OR ANY OTHER COUNTRY OR JURISDICTION, AS A RESULT OF ANY SPILLAGE OCCURRING WHILST THE "FUEL" IS BEING TRANSPORTED DIRECTLY TO OR FROM THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE BUYERS.
THE BUYERS SHALL SIMILARLY INDEMNIFY THE SELLERS WHERE ANY OF SUCH SPILLAGE OCCURS ONCE RISK IN THE "FUEL" HAS PASSED THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH A SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE SELLERS.

THE SELLERS SHALL ENSURE THAT THE BARGE COMPANY IS INSURED FOR OIL SPILLAGE DAMAGES UP TO A MINIMUM AMOUNT PER INCIDENT REQUIRED BY THE APPLICABLE LOCAL STATUTORY RULES OR REGULATIONS. IF SUCH COVERAGE OR INSURANCE IS NOT OBTAINED BY THE BARGE COMPANY IT SHALL BE THE SOLE RESPONSIBILITY OF THE SELLERS TO ESTABLISH SUCH COVERAGE FOR THEIR ACCOUNT.
PROOF AND CONDITIONS OF SUCH COVERAGE, WHETHER ESTABLISHED BY THE BARGE COMPANY OR BY THE SELLERS SHALL BE MADE AVAILABLE TO THE BUYERS AT THEIR REQUEST, AS SOON AS PRACTICALLY POSSIBLE AND BEFORE THE DELIVERY OF THE "FUEL".

18. LAW AND ARBITRATION

THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE LONDON MARITIME ARBITRATION ASSOCIATION ( LMAA ) RULES IN FORCE AT THE TIME THAT THE ARBITRATION PROCEEDINGS ARE COMMENCED.
THIS CONTRACT SHALL BE COVERED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF THIS CONTRACT SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION ACT 1996 OR ANY STATUTORY MODIFICATION OR RE - ENACTMENT THEREOF FOR THE TIME BEING IN FORCE. UNLESS THE PARTIES AGREE UPON A SOLE ARBITRATOR, ONE ARBITRATOR SHALL BE APPOINTED BY EACH PARTY AND THE ARBITRATORS SO APPOINTED SHALL APPOINT A THIRD ARBITRATOR, THE DECISION OF THE THREE-MAN TRIBUNAL THUS CONSTITUTED OR ANY TWO OF THEM, SHALL BE FINAL. ON THE RECEIPT BY ONE PARTY OF THE NOMINATION IN WRITING OF THE OTHER PARTY'S ARBITRATOR, THAT PARTY SHALL APPOINT THEIR ARBITRATOR WITHIN FOURTEEN DAYS, FAILING WHICH THE DECISION OF THE SINGLE ARBITRATOR APPOINTED SHALL BE FINAL.
GERMAN LAW SHALL APPLY ON THE "FUEL" CONTRACT WHENEVER THE SELLERS HAVE THEIR PLACE OF BUSINESS IN GERMANY.
IN THIS CASE ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT OR CONCERNING ITS VALIDITY SHALL BE FINALLY SETTLED BY ARBITRATION IN HAMBURG IN ACCORDANCE WITH THE ARBITRATION RULES OF THE GERMAN MARITIME ARBITRATION ASSOCIATION (GMAA).

HAPAG-LLOYD AG

HAMBURG                                                                                               JULY 2014

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D-22763 Hamburg
Phone +49 40 32 55 90/0 - Fax +49 40 33 04 71
e-mail: hamburg@owbunker.de

7.11.3849.00 15023934

# Exhibit 3

| | |
|---|---|
| **From:** | Lukas Gaus |
| **To:** | khse@owbunker.de; Gaus, Lukas; trading@owbunker.de |
| **Subject:** | MV Box Trader/USLAX PO 4504076113 |
| **Date:** | Freitag, 17. Oktober 2014 15:10:52 |

TO  : O.W. Bunker Germany GmbH
FOR  : BUNKER DEPARTMENT

HAPAG-LLOYD BUNKER PURCHASE ORDER

WE HEREWITH CONFIRM HAVING NOMINATED IN ACCORDANCE WITH OUR TERMS AND
CONDITIONS OF PURCHASE LATEST EDITION (A COPY SHOULD ALREADY BE IN YOUR
POSSESSION - PLEASE ADVISE IF A FURTHER COPY IS REQUIRED) AND TO ANY
AMENDMENT THERETO WHICH MAY HAVE BEEN AGREED BETWEEN US.

ALL FUEL DELIVERED TO HAPAG-LLOYD AG AS WELL AS TO HAPAG-LLOYD
KREUZFAHRTEN HAVE TO MEET ISO 8217 FOURTH EDITION 2010-07-01 - REFERENCE
NO. ISO 8217:2010 (E) PETROLEUM PRODUCTS FUELS (CLASS F) -
SPECIFICATIONS OF MARINE FUELS AND ANY AMENDMENT THERETO AND MUST BE IN
ACCORDANCE WITH MARPOL 73/78 ANNEX VI AND ANY AMENDMENT THERETO.

REF.NO.   : 028/4504076113 TO BE STATED ON INVOICE
ACCOUNT    : HAPAG-LLOYD AG, HAMBURG
SELLER    : O.W. Bunker Germany GmbH,

VESSEL    : MV Box Trader
PORT    : LOS ANGELES, CA
DATE    : ESTIMATED ARRIVAL ON 22.10.2014
          ETA AND ETD SUBJECT TO CHANGE, PLEASE COORDINATE
          TIME OF DELIVERY CAREFULLY WITH AGENT
AGENTS    : Norton Lilly, Los Angeles

POSITION   : 00010
QUANTITY   : 1.000,000 TO
ISO GRADE  : MARINE FUEL OIL ISO RMG 380 MAX 3,50% SU
PRICE    : 484,00 USD / TO FOB
SUPPLIER   : OW Bunker

DELIVERY   : STRICTLY ONE BARGE LOAD UPON VESSEL'S ARRIVAL
SURVEYOR   : Oiltest APPOINTED, PHONE:


---ADDITIONAL REMARKS---
ISO GRADES  : SELLER HAS TO ENSURE THAT THE PRODUCT DELIVERED IS
          DERIVED FROM PETROLEUM CRUDE OIL AND MUST NEITHER
          CONTAIN: CONTAMINANTS (I.E. CHEMICAL
          WASTE, POLYPROPYLENE, USED LUBRICANTS, ABRASIVE
          MATERIALS) NOR BLENDING COMPONENTS DERIVED FROM COAL
          AND SHALE DISTILLATIONS PROCESSES.

SPECIFICATION: SUPPLIER WILL ADVISE BUYER AT LATEST 24H
          (OR THE LAST WORKING DAY BY NOON; HAMBURG TIME)
          BEFORE DELIVERY ABOUT TYPICAL SPECIFICATIONS OF
          THE ABOVE MENTIONED PRODUCTS:

          CCAI: MAX. 855 FOR RMG 380/
          CCAI: MAX. 865 FOR RMK 500 / RMK 700

DELIVERY    : - TRANSFER TEMP.: MIN. 50 °C - MAX. 70 °C
          IF DELIVERY HAS TO BE ARRANGED BY MORE THAN ONE BARGE,
          TYPICAL SPES OF EACH BARGE LOAD TO BE ADVISED WELL IN
          ADVANCE IN CASE SPECS ARE NOT IDENTICAL.
          IN CASE SUPPLIER FAILS TO DELIVER QUANTITY IN FULL

WITHIN LAYTIME OR VESSEL WILL BE DELAYED DUE TO BAD
PERFORMANCE THEN THE SELLER/SUPPLIER WILL DELIVER THE
QUANTITY IN QUESTION IN THE NEXT PORT OF CALL WITHOUT
ANY COSTS TO THE BUYER AND WILL ALSO PAY FOR THE FUEL
WHICH WILL BE CONSUMED IN ADDITION TO SPEED UP FOR
COMPENSATION. ALL DEMURRAGE AND PUMP BACK CHARGES
RESULTING THEREFROM TO BE ABSORBED BY THE SELLER AS WELL.

SURVEY      : IT IS MUTUALLY AGREED TO APPOINT A SURVEYOR TO
CARRY OUT THE QUANTITY/QUALITY SURVEY.
IT IS FURTHER AGREED THAT VOLUMES SHOWN IN THE
B.D.R. ARE FINAL TO ALL PARTIES AS LONG AS THEY DO
NOT DIFFER MORE THAN TOTAL 0,3% COMPARED TO THE
FINDINGS OF THE SURVEYOR.

SAMPLING    : THE SAMPLES SHALL BE DRAWN JOINTLY AT A POINT TO
BE MUTUALLY AGREED BETWEEN ALL PARTIES, BUT
CLOSEST TO THE VESSEL'S MANIFOLD.
5 SAMPLES MUST BE DRAWN AND DISTRIBUTED:
MASTER: 1   SUPPLIER: 2   SURVEYOR: 2

IT IS MUTUALLY AGREED BETWEEN SELLER/SUPPLIER AND
BUYER TO USE ONLY SAMPLE BOTTLES FITTED WITH TWO SEAL
LUGS. IN CASE SUPPLIERS CANNOT PROVIDE SUCH BOTTLES
THEN VESSEL'S REPRESENTATIVE SHALL HAND OVER SAID
BOTTLES TO SUPPLIERS FREE OF CHARGE. SAMPLES TO BE
SIGNED BY BOTH PARTIES, SEALED BY SUPPLIER AND
COUNTERSEALED BY VESSEL'S REPRESENTATIVE.
IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION
OR BEYOND BUYERS CONTROL ARE NOT LEGALLY BINDING IN
CASE OF A DISPUTE. THIS INCLUDES ALSO BUNKERSTEMS NOT
ATTENDED BY AN INDEPENDENT SURVEYOR. SUCCESSFUL HAND
OVER OF SUCH INSTALLATION SAMPLES OR SPECICAL ACCEPTANCE
NOTES ON CORRESPONDING BUNKER RECEIPTS EVEN THOUGH
ACCEPTED BY THE VESSEL BY SIGNING SUCH RECEIPTS OR
SAMPLES ARE DECLARED AS NOT REPRESENTATIVE BY ALL MEANS.

PAYMENT     : 30 DD / 15 DI
IF WE DO NOT RECEIVE YOUR INVOICE WITHIN 15 DAYS
AFTER DATE OF DELIVERY, THE DUE DATE TO BE EXTENDED
BY THE NUMBER OF DELAYED DAYS ACCORDINGLY.
IN THAT CASE NO INTEREST WILL BE PAID.

INVOICING   : BY REGULAR MAIL OR COURIER.
PLEASE SEND YOUR INVOICES STRICTLY TO:
HAPAG-LLOYD AG
8300 FINANZ-& RECHNUNGSWESEN
BALLINDAMM 25
20095 HAMBURG
GERMANY

PLEASE KEEP CLOSE CONTACT TO AGENTS, RECHECK ALL DETAILS MENTIONED.

SELLER/SUPPLIER WARRENTS THAT THE PRODUCT OFFERED OR NOMINATED IN A
POTENTIAL ORDER IS NOT DESIGNATED IN ANY SANCTIONS LIST ISSUED BY THE
UN, US OR EU AND IS NOT OWNED OR CONTROLLED BY ANY PERSON OR ENTITY
REGISTERED IN OR OPERATING FROM SYRIA, IRAN OR DESIGNATED IN ANY
SANCTIONS ISSUED BY THE UN, US OR EU.

MANY THANKS AND BEST REGARDS.
Lukas Gaus
-------------------------------------------------------------
HAPAG-LLOYD AG
4140 FUEL/LUBRICANTS PURCHASING & SUPPLY
BALLINDAMM 25
20095 HAMBURG

PHONE  +49 40 30012650-
FAX    +49 40 30012658-
MAILTO lukas.gaus@hlag.com
www.hapag-lloyd.com

Vorsitzender des Aufsichtsrats: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Vorstand: Rolf Habben Jansen, Vorsitzender, Anthony J. Firmin, Peter
Ganz
Sitz: Hamburg, Handelsregister: Amtsgericht Hamburg HRB 97937

Chairman of the Supervisory Board: Dipl.-Ing. Dr.-Ing. E.h. Jürgen Weber
Executive Board: Rolf Habben Jansen ( CEO ), Anthony J. Firmin, Peter
Ganz
Registered Office: Hamburg, Company Register: Amtsgericht Hamburg HRB
97937

**O.W. Bunker Germany GmbH**
**WW Division**

(W) **Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3255900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03458
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.   119-28293

Hamburg   17. October 2014

We are hereby pleased to acknowledge receipt of your order as follows :

| | |
|---|---|
| Vessel | BOX TRADER (IMO: 9423035) |
| Port | LOS ANGELES |
| Delivery date | 22. October 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV BOX TRADER AND/OR HAPAG-LLOYD AG |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 1.000,00 | MT | Fueloil 380-CST 3,5% | USD | 484,00 | MT | OW Bunker |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2007 shall apply |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

**O.W. Bunker Germany GmbH**
**WW Division**



TERMS AND CONDITIONS.
------------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is
requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified
quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any
dispute regarding quality to be settled by testing these retained samples by an independent laboratory at
port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and
Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall
be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker
Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the
terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for
Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested
Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid
quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR
UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

**BEFORE BUNKERING:**

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

**DURING BUNKERING:**

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

**AFTER COMPLETION:**

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

**QUANTITY COMPLAINTS:**

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# O.W. Bunker North America Inc.



Two Stamford Plaza, 15th Floor
281 Tresser Boulevard
Stamford, CT, 06901

## Bunker delivery receipt

| | | | |
|---|---|---|---|
| Delivery date: | Oct   2014 | Alongside: | 2130 |
| Receiving vessel: | BOX TRADER | Hose connected: | 2215 |
| IMO number: | 9423035 | Commenced pumping: | 2320 |
| Flag: | | Completed pumping: | 0255 |
| Port/location: | LA-214 | Hose disconnected: | 0330 |
| Bound for: | | Departure: | 0400 |
| Delivered by: | DAVID FANNING | | |

| Description<br>Product delivered | Litres<br>Net @ 15°C | BBLS<br>Net | Metric tons in air<br>(3 decimal) | BBLS<br>Gross |
|---|---|---|---|---|
| HSRMG 380 | | 6401.62 | 1005.695 | 6500.43 |
| | | | | |
| | | | | |
| | | | | |

| | HS RMG380 | LSRMG380 | Marine Gas Oil | Marine Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity @ 50°C | 231 | | | |
| Density in kg/m³ @ 15°C per ISO 3675 | 989.6 | | | |
| Water content, % | | | | |
| Sulphur content in % per ISO 8754 | 3.37 | | | |
| Flash point, °F | 170 | | | |
| Pour point, °F | — | | | |
| API Gravity @ °F | 11.4 | | | |
| Ash content | | | | |
| Delivered temperature, °C | 100 °F | | | |

**Sample seal numbers**

| | |
|---|---|
| Receiving vessel: | 36823151 |
| MARPOL ANNEX | 36823934 |
| Barge: | 36823961 |

Remarks: # 209 - 10301          WMS # 32058

*IMPORTANT NOTICE* THE GOODS ARE HEREBY ACKNOWLEDGED AS BEING ACCEPTED AND/OR ORDERED AND ARE BEING ACCEPTED SOLELY FOR THE ACCOUNT OF THE OWNERS OF THE VESSEL "BOX TRADER" AND NOT FOR THE ACCOUNT OF HER OWNERS MESSRS/ AFFECTED OR HER OWNERS LIEN OR OTHERWISE SHIPPED OR ACCORDING IN ANY NO CAN ARISE THERETO AGAINST THE VESSEL OR HER OWNERS

Received the above in good condition.
Also received three representative drip samples each grade collected from ship manifold whilst bunkering.
Page 1: Administration. Page 2: Barge. Page 3:Receiving vessel. Page 4: Receiving vessel.
"Fuel oil supplied is in conformity with Marpol regulation 14(1) and 18(1). According to regulation 4(a), the sulphur
content of fuel oil used on board ships in a SOx emission control area must not exceed 1,0 % m/m"

John Costello
John Costello

Supplier's stamp and signature
David Fanning
1214967

M/V "BOX TRADER"
MONROVIA
Vessel's stamp

For Volume at
Observed Temperature Only

Signature chief engineer/Master


IBIA

SM9969368
(5160S195)



(W) **Bunker**

gebucht
06. Nov. 2014
M. Sakowski

**M/V BOX TRADER**
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG
8300 Accounting
Ballindamm 25
D-20095 Hamburg
Germany

Hapag-Lloyd AG
Accounting
5. Nov. 2014
**EINGANG**

| | |
|---|---|
| DATE OF INVOICE | : 27. October 2014 |
| INVOICE NO | : 119-29498 |
| ORDER NO. | : 119-28293 |
| DATE OF SUPPLY | : 27. October 2014 |
| DUE DATE | : 26. November 2014 |

PORT: LOS ANGELES
YOUR REFERENCE: 028/4504076113

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 1.005,695 MT | Fueloil 380-CST 3,5% | 484,00 MT | 486.756,38 |



HL0010018751427 R

1,26660

| Our VAT No. | DE814847085 | Total | USD | 486.756,38 |
|---|---|---|---|---|

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of delivery With value date not later than DUE DATE or previous working day when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | | |
|---|---|---|---|
| **BANK:** | ING Bank N.V. | | **O.W. BUNKER GERMANY GMBH** |
| | | | Neumühlen 11 |
| **ACCOUNT:** | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies | |
| | IBAN: NL10 INGB 0651 3696 81 | EUR | D-22763 Hamburg |
| | | | |
| | SWIFT: INGBNL2A | | Phone: +49 40 3255900 |
| | | | Fax: +49 40 330471 |
| | | | |
| | | | Tax No. / Steuer Nr. 41/768/03458 |
| | | | |
| | | | E-mail: trading@owbunker.de |
| | | | Internet: http://www.owbunker.com |

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

Managing director: Götz Lehsten
HR B 100089

261 Tresser Boulevard
Stamford, CT, 06901

WMS 32058

## Bunker delivery receipt

| | |
|---|---|
| Delivery date: Oct 30H | Alongside: 8130 |
| Receiving vessel: BOX TRADER | Hose connected: 2815 |
| IMO number: 9403035 | Commenced pumping: 0200 |
| Flag: | Completed pumping: 0355 |
| Port/location: LA-214 | Hose disconnected: 0330 |
| Bound for: | Departure: 0400 |
| Delivered by: DAVID FANNING | |

| Description Product delivered | Litres Net @ 15°C | BBLS Net | Metric tons in air (3 decimal) | BBLS Gross |
|---|---|---|---|---|
| HS RMG 380 | | 640.662 | 1005.695 | 1500.43 |
| | | | | |
| | | | | |

| | HS RMG380 | LSRMG380 | Marine Gas Oil | Marine Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity @ 50°C | 231 | | | |
| Density in kg/m³ @ 15°C per ISO 3675 | 989.6 | | | |
| Water content, % | — | | | |
| Sulphur content in % per ISO 8754 | 3.37 | | | |
| Flash point, °F | 170 | | | |
| Pour point, °F | — | | | |
| API Gravity @ °F | 11.4 | | | |
| Ash content | — | | | |
| Delivered temperature, °C | 100°F | | | |
| Sample seal numbers | | | | |
| Receiving vessel: | 36823751 | | | |
| Marpol ANNEX | 36823934 | | | |
| Barge: | 36823961 | | | |

Remarks: # 809 + 10301          WHS # 32058

Received the above in good condition.
Also received three representative drip samples each grade collected from ship manifold whilst bunkering.
Page 1: Administration. Page 2: Barge. Page 3: Receiving vessel. Page 4: Receiving vessel.
*Fuel oil supplied is in conformity with Marpol regulation 14(1) and 18(1). According to regulation 4(a), the sulphur content of fuel oil used on board ships in a SOₓ emission control area must not exceed 1,0 % m/m*

John Costello
Jhn Cstello

Supplied Marine/Belgium
David Fanning
1214987

M.V. BOX TRADER

For Volume at
Observed Temperature Only

Signature chief engineer/Master

**Sakowski, Marion**

| | |
|---|---|
| Von: | Victoria Bohn [vibo@owbunker.de] |
| Gesendet: | Dienstag, 4. November 2014 09:57 |
| An: | Sakowski, Marion |
| Betreff: | RECHNUNG & LIEFERSCHEIN MV BOX TRADER |
| Anlagen: | BOX TRADER2014-11-04-132215.pdf |

Hallo Frau Sakowksi,

anbei erhalten Sie Rechnung und Lieferschein für die Bunkerung

MV BOX TRADER in LOS ANGELES am 27-10-14

Die Originale folgen per Kurier.

Wir danken für Ihren Auftrag und verbleiben,

Mit freundlichen Grüßen / With best regards

 **Bunker**

**O.W. Bunker Germany GmbH**

Member of O.W. Bunker Group

**Victoria Bohn**

Administration / Accounts

| | |
|---|---|
| Office: | + 49 40 32 55 900 |
| Direct: | + 49 40 32 55 90 32 |
| Fax: | + 49 40 33 04 71 |
| E-mail.: | vibo@owbunker.de |
| Office E-mail: | trading@owbunker.de |
| Web: | www.wristgroup.com |

**O.W. Bunker Germany GmbH, Neumühlen 11, 22763 Hamburg**

Geschäftsführer Götz Lehsten / Sitz: Hamburg / Handelsregister: Amtsgericht Hamburg HRB 100089 / Managing Director: Götz Lehsten / Registered Seat: Hamburg / Company Register: Amtsgericht Hamburg HRB 100089

*This email and any attachments may contain confidential information and is intended only for the use of the recipient named above. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited, and you are requested to please delete this message and any copy of it immediately from your computer system and kindly notify the sender. Opinions expressed in this email are those of the individual, and do not necessarily represent those of O.W. Bunker Germany GmbH. Whilst O.W. Bunker Germany GmbH has taken steps to minimise the risk of software virus contamination, it cannot accept liability for any damage from any virus software or the like contained in this email. Thank you!*

Please consider the environment before printing this email

1