

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Darren Azman
Associate
dazman@mwe.com
+1 212 547 5615

February 25, 2016

VIA ECF

The Honorable Valerie E. Caproni
U.S. District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:  *Bonny Gas Transport Ltd. v. O.W. Bunker Germany GmbH*, 14-cv-9542
     *Hapag-Lloyd AG v. U.S. Oil Trading LLC*, 14-cv-9949
     *Hapag-Lloyd AG v. O'Rourke Marine Services L.P.*, 14-cv-10027
     *Hapag-Lloyd AG v. O.W. Bunker North America, Inc.*, 15-cv-190

Dear Judge Caproni:

We represent O.W. Bunker Germany GmbH ("OW Germany"), together with our co-counsel
Hill Rivkins LLP, in the above-referenced actions.

We are writing in response to Your Honor's Order dated February 22, 2016 in action 14-cv-
9542, Dkt. # 139 (the "Order"), to request: (i) a short extension of time to complete discovery on
the ING assignment issue; and (ii) a protective order deeming the personal testimony of OW
Germany's former employees to be sufficient for certain areas of inquiry pursuant to Rule
26(c)(1)(C).

The Order provides that NuStar Terminals Marine Services N.V. and Nustar Energy Services,
Inc. ("NuStar") "may question OW Germany's witnesses regarding, inter alia: (a) OW
Germany's objections, if any, to the assignment; (b) communications between OW Germany and
its parent company, ING or customers regarding the assignment; and (c) the impact of the
assignment on OW Germany." The Order also clarifies "for the avoidance of doubt" that NuStar
is *not* entitled to ask questions regarding OW Germany's communications with its counsel or its
litigation strategy vis-à-vis ING or others with respect to the assignment issue. The Order does
not, however, specify whether the testimony should be given by OW Germany's witnesses in
their individual capacities or as corporate representatives pursuant to Rule 30(b)(6).

The Honorable Valerie E. Caproni
**February 25, 2016**
Page 2

The Order was entered on the ECF system on February 23, 2016 at 10:06am ET, at which time the parties were in the midst of taking the deposition of Mr. Götz Lehsten, OW Germany's former Managing Director, by video conference from Hamburg, Germany pursuant to Rule 30(b)(6) notices served by NuStar and Hapag-Lloyd AG ("Hapag"). On February 24, 2016, the parties took the deposition of the former Manager of OW Germany's Trading Department, Mr. Boris Gronenberg, pursuant to the same notices.

Given the timing of Your Honor's Order, the impending discovery deadline on February 26, 2016, and the difficulties associated with scheduling the depositions of two former employees in Germany, we advised counsel for all parties in attendance at the depositions that they would be permitted to question Messrs. Lehsten and Gronenberg as to their personal knowledge about the assignment issue, while reserving the right to later designate a Rule 30(b)(6) representative on the topic, if needed and to the extent permitted.

As former Managing Director of OW Germany, Mr. Lehsten was generally aware of agreements between the OW Bunker Group and financial institutions, but indicated that such agreements would have been negotiated and handled by the parent company in Denmark. Attached hereto as **Exhibit A** are excerpts from Mr. Lehsten's testimony (still in rough draft format, given the short amount of time since his deposition took place) in which he explained, *inter alia*, that: (i) he did not have "deep insight" into the discussions between the lending banks and the CFO and Treasurer of the Danish parent company; (ii) he was never involved in the finance issues of the OW Bunker Group; (iii) the one credit committee on which he sat only dealt with extending credit to OW customers; (iv) to the best of his knowledge, there were no direct communications between OW Germany and ING; (v) there probably were no communications between OW Germany and the Danish parent company about the "Notice of Assignment" attached to Plaintiff's Complaint as Exhibit 4 in action 14-cv-9542; and (vi) he doubts whether OW Germany ever transmitted the Notice of Assignment to its customers. Consistent with this testimony, we again note that the English Omnibus Security Agreement between ING and various "Chargors" was executed by Messrs. Jim Pedersen and Morten Skou, the former CEO and CFO, respectively, of O.W. Bunker & Trading A/S ("OW Denmark") as attorneys-in-fact. Likewise, the Notice of Assignment was also executed by Mr. Pedersen.

As former Manager of OW Germany's Trading Department, Mr. Gronenberg likewise testified that he: (i) did not see the Notice of Assignment executed by Mr. Pedersen in 2013; (ii) was not aware as to whether the Notice of Assignment was sent to OW Germany's customers; and (iii) was not familiar with the English Omnibus Security Agreement. Attached hereto as **Exhibit B** are excerpts from Mr. Gronenberg's testimony (again in rough draft format).

Insofar as OW Germany is an insolvent company with no current employees who could potentially supplement the foregoing, we submit that the personal testimony of Messrs. Lehsten and Gronenberg should be deemed sufficient for purposes of complying with sections (b) and (c) of the Order. Apart from their personal knowledge, there is no information that is "reasonably available" to OW Germany's insolvency administrator on these topics. Thus, there is no

The Honorable Valerie E. Caproni
**February 25, 2016**
Page 3

reasonably available information that could be used to further educate some other witness for purposes of testifying about possible communications or the impact of the alleged assignment on OW Germany (which are extremely broad topics to begin with), particularly on short notice. Furthermore, it would be unreasonable to place the burden on OW Germany to secure the testimony of non-party witnesses in Denmark (such as the former CFO of the parent company), over whom OW Germany's insolvency administrator has no control.  Accordingly, we respectfully request that the Court enter a protective order pursuant to Rule 26(c)(1) deeming the personal testimony of Messrs. Lehsten and Gronenberg to be sufficient for purposes of complying with sections (b) and (c) of the Order, and thereby preventing NuStar or any other party from seeking further testimony or other relief under Rule 37.

As for section (a) of the Order, we respectfully request a short extension of the current discovery deadline to address any "objections" to the assignment.  We propose extending the deadline to March 18, 2016, so that we can properly consult with Dr. Gideon Bohm, OW Germany's Insolvency Administrator, and coordinate the designation of a representative to testify about this discrete issue on behalf of OW Germany pursuant to Rule 30(b)(6).

We have conferred with opposing counsel about the request for another extension.  ING does not object to the request.  NuStar's counsel consents to the request, but only for the purpose of taking the deposition of OW Germany's representative on the assignment issue.  Hapag's attorneys are still waiting on instructions from their client, but object to any extension that would impact the amount of interest that Hapag may have to post.  Likewise, Bonny Gas' counsel objects to extending the discovery deadline to the extent that any party will demand additional interest or security, or object to Bonny Gas' request for the return of accrued interest and excess security. Otherwise, we have not received responses from counsel for U.S. Oil Trading LLC and O'Rourke Marine Services L.P.

Respectfully submitted,

Darren Azman

DM_US 70485903-2.T14057.0010

# Exhibit A

27

1    A.  Basically it's a definition. Basically we call

2    ourselves resellers.  Others may call it trading.

3    Resellers is by definition basically where you value X

4    in your own name, where you sell it to somebody in your

5    own name and you purchase from a third party for your

6    own account.

7        So, many different words for bunker traders,

8    right.  In U.S. I think they're called marketers

9    whatever that means, I have no clue.

10    Q.  Okay.  But the bottom line, whether you call it a

11    reseller or trader you were -- O. W. Germany was acting

12   in its own name and it was purchasing bunkers for its

13   own account?

14   A.  Yes.

15        MR.  HEILIG:  Objection, form.

16   Q.  I'm trying to move it along.  I want to talk to

17   you next about the credit lines that the O. W. Bunker

18   group the in place at various points in time.  The that

19   something you're familiar with credit lines from outside

20   investors?

21        MR.  HEILIG:  Note my objection pursuant to

22   our written objection to the deposition topic.

23   A.  The only part I have been involved when it comes

24   to credit lines was that I have been part of the credit

25   committee in the group deciding about credit given to

28

1   customers.

2      Q.  Just off the record.  Discussion off the record)?

3      Q.   Sir, are you aware in your capacity as Executive

4   Vice President and whatever other roles you were

5   appointed to as of December of 2013, that the O. W.

6   Group had entered into a security agreement with what

7   I'll describe as a consortium of banks but I'll refer to

8   it as the ING Security Agreement.

9          MR. MALONEY:  Objection to form.

10          MR.  HEILIG:  Object to form.

11      A.  Of course to some extent I have been informed by

12   the CFO and Treasury at that time that they have been in

13   negotiations with the banks syndicate but that those

14   informations were -- I didn't have very deep insight

15   into those discussions; only that the agreement has been

16   fixed in a certain time.

17        But don't ask me about details of particulars

18   about that agreement.

19   Q.  Okay.  Do you know if the O. W. Bunker group

20   prior to 2013 had any type of credit or security

21   agreement that was in place by any lending institution,

22   this was this is prior to 2013?

23        MR.  HEILIG:  Object to form.

24   A.  I couldn't -- I can't reply.


25   Q.  You don't know?

29

1    A.  I have never been involved in the finance issues

2    of the group.

3    Q.  All right but you were in charge of the trading

4    or the reselling and the profits and losses generated in

5    that division; is that correct?

6        MR.  HEILIG:  Object to form.

7    A.  I don't understand your question.

8    Q.  I'm just trying to understand what information

9    you would have provided and what involvement you would

10   have had with regard to a decision by the O. W. Bunker

11   group to go out and seek a credit line.

12          MR. MALONEY:  Objection to form.

13     Q.  Let me just back up a little bit.  You indicated

14   that with regard to the I NG security agreement which is

15   dated 19 December 2013, that you were part of a

16   Creditors Committee at this or actually you said you

17   were part of a Creditors Committee at this and that is

18   with regard to credit given the customers correct?

19     A.  Yes yes.

20     Q.  But insofar as the need and the requirement for

21   the O. W. Bunker group to reach out to I NG and other

22   banks and obtain a credit line, I'm wondering what

23   information or what interaction, what knowledge you had

24   of that process?

25      A.  I think that we have to turn the other way

30

1   because as I mentioned here I have been doing the

2   strategy nor the reselling units and therefore of course

3   I had some demands to the CFO about liquidity.  We need

4   to develop the business.  And of course the assumption

5   was volume with development of growth overall but also

6   with oil prices.    End of the day it was the financial

7   department telling me how much money so to speak I had

8   available to manage my business.

9        So I had input about the potential business we

10   could do which was basically used for the financial

11   division to negotiate with the banks about how much

12  credit we can obtain.

13      But then in reselling -- in reselling we have

14  probably used much less money as the other divisions

15  like physical and cargo trading and hedging.

16   Q.  What's the purpose of a bank like ING providing

17  to the O. W. Bunker group a credit line which in this

18  case I think was up to 7 $100 million is that correct, 7

19  $100 million based upon the terms of the agreement.  How

20  would that money be used.  What was the purpose of that

21  credit line?

22      MR.  HEILIG:  Objection to form.  You can

23  answer if you know.

24    A.  You're asking the motivation for the bank.

25   Please ask the bank.  Why you need that money in the

31

1   bunker industry, that can be many, many different

2   reasons, in reselling quite often was there's a

3   difference between the day you receive the money and you

4   get paid from your customers, that can be potentially up

5   to 2, three days.

6        Third, we have the terminal of couple of

7   million tons and then you need liquidity to fund that.

8   There can also be an imbalance in payment days where you

9   buy from a supplier on 14 days and you sell to your

10  customer in thirty days or 45 days.

11       When it comes to the other divisions like

12   physical, you basically buy your replenishment on day of

13   arrival and then it takes another 30 or 40 days to serve

14   the product to your customer.  So in different areas

15   where bunker companies like O. W. Bunker Group needs a

16   lot of finance.

17      Q.  Prior to 2013, December, 2013, was there a

18   different financial group that would provide finance or

19   did provide finance to the O. W. Bunker group for the

20   same reasons you just described?

21      A.  Yes, it was probably I don't recall who it was in

22   that year.  I don't recall.

23      Q.  Okay.  But there was there was a prior lender,

24   prior banking?

25      A.  Yes.

39

1   clue to what extent.

2     Q.  Were there discussions in the third quarter

3   amongst the management team as to the financials and the

4   fact that things were looking very bad at that point?

5         MR. HEILIG:  Objection to form.

6     A.  I thought I have to come as a witness to clarify

7   the interaction between Hapag-Lloyd and O. W.  And now

8   we're into the group in 2014.

9         MR.  HEILIG:  What topic are we talking

10   about here for clarification purposes.

11     Q.  Number, was it 17 --the credit line.  We're

12   trying to understand what was happening with the credit

13   line, what was happening with the group infusion of?

14          THE WITNESS:   Maybe I misleaded you

15   earlier.  I have been part of a Credit Committee when it

16   comes to credit line towards clients.  Like we probably

17   had a credit line of 100 million, $130 million and in

18   that credit committee together with the credit manager

19   and 2, three other persons we decided and together with

20   the credit insurance company we decided to -- I just

21   tried to clarify here that I have been involved in the

22   credit management for clients but not in the credit

23   management for the group when it comes to banks or

24   financing.  That was done by the CFO so as member of the

25   credit management it was only towards clients not

40

1   towards banks if that makes sense.

2      Q.  Okay.  Just I have one other question on this

3   third quarter issue.  Was that something that was

4   available to the public as to the third quarter of the

5   O. W.  Group was very bad?

6          MR. HEILIG:  Object to form.

7      A.  O. W.  Was a public -- was IPO'd in March 2014 so

8   all formal reports have been public.

9      Q.  Okay.  That's all I have for now thank you, sir I

10   appreciate it.  We're going to reserve our rights.

11          MR. LETOURNEAU:  Shall I start.

12        MR. AZMAN:  Go ahead Keith.

13        Examination by.

14        MR. LETOURNEAU:

15    Q.  Good afternoon Mr. Lehsten.

16    A.  Yes,  it's okay.

17    Q.  Sir, looking at NuStar's and I represent NuStar

18  Terminals Marine Services N V.

19        Looking at the Deposition Notice that we had

20  previously served, you have been identified as the

21  witness to respond to topics 1, 3, 5, 7, 8.  This is

22  part of exhibit --  this is part of Exhibit number 1.

23        It's our Deposition Notice NuStar's Deposition

24   Notice to O. W. Germany.  Mr. Lehsten has been

25   identified as the corporate representative to speak to

56

1  sign them.

2     Q.  Did O. W. Germany ever object to that notation of

3  assignment at any time prior to November 2014.

4          MR.  HEILIG:  Object to form.

5     A.  No, I don't think so. I didn't.

6     Q.  Can you tell me what, can you tell me sir what

7  communications were exchanged between O. W. Germany and

8  its parent company about that notice of assignment.

9          MR. HEILIG:  Object to form.

10     A.  Probably no communication at all.

11     Q.  Can you tell me what communications were

12   exchanged between O. W. Germany and ING Bank about the

13   notice of assignment?

14        MR.  HEILIG:  Same objection.

15     A.  I think there has never been any communication

16   between the German entity and the ING Bank directly to

17   the my best knowledge.

18     Q.  Did you or O. W. Germany ever transmit that

19   notice of assignment to any of your customers?

20     A.  I never did myself.  I doubt that any employees

21   of the company ever did.

22     Q.  Did the notice of assignment affect how payments

23   were made to O. W. Germany?

24    A.  Can you repeat that, please.


25    Q.  Yes.   Yes, did the notice of assignment affect

57

1  how payments were made to O. W. Germany?

2      A.  That you need explain how can that affect the

3  payments to O. W. Bunker.

4      Q.  Well in other words, the notice of assignment

5  provides that monies are to be paid instead of to the O.

6  W.  Entity, they're to be paid to ING Bank and so the

7  question is, did the that notice of assignment affect

8  payments that O. W. Germany would have received but for

9  the notice of assignment?

10          MR. HEILIG:  Object to the form.

11      A.  I think you're confusing me now.  If the customer

12   didn't know about the agreement how can that impact the

13   payment.

14      Q.  That's the question to you, is did you transmit

15   it to any of your customers?

16      A.  No, I said I did not.

17      Q.  So what did O. W. Germany do with the notice of

18   assignment?

19      A.  I simply recall it.  I mean such a document

20   should have been sent to me but by traveling hundred

21   twenty days a year, globally, maybe has not been sent.

22   I simply cannot answer that question but it has been

23   sent or put in a tray where it showed up once a month I

24   simply cannot recall that.


25        MR.  HEILIG:  We have a strange noise.  It

96

1  the A RA contract where you had said, we're looking at

2  clause 18 and you had said that from a commercial -- I'm

3  paraphrasing ^ here ^ hear correct me if I'm wrong but I

4  believe what you had testified was that you didn't like

5  German law from a commercial perspective; is that

6  correct?

7        MR. HEILIG:  Object to form.  You can

8  answer.

9    A.  It is basically yes, but that's going too far

10  German entities against German shipping companies  and

11  it's not easy when it comes to disputes.

12        When it comes to disputes therefore we found it

13    more comfortable in UK law.

14    Q.  No further questions thank you.

15        MR. HEILIG:  Anything else Mr. Lehsten?  I'm

16    sorry Mike did you have any follow-ups.

17        MR. FERNANDEZ:  I think I'm good for the

18    moment.

19        MR.  HEILIG:

20    Q.  One question.  You discussed earlier a financial

21    group negotiating with banks, do you recall that

22    testimony?

23    A.  Sorry.

24     Q.  Earlier you discussed the financial group that

25   negotiated with banks.  Do you recall testifying about

97

1   that?

2       A.  Financial department.

3       Q.  Department where is that department located?

4       A.  In Warborg.

5       Q.  Please read back the last question and the last

6   response or as much of it as you were able to get.

7           Read back

8       A.  In Warborg, that's W ARB OR G the head office of

9   O. W. Bunker or was the head office.

10      Q.  Was that department part of O. W. Germany?

11      A.  No.

12     Q.  No further questions from me.  (?

13          MR. AZMAN:  Mike has just one follow-up

14  question here.

15          MR. FERNANDEZ:

16          MR. FERNANDEZ:  No further questions.

17          MR. AZMAN:  I don't believe that anybody has

18  any further questions for the witness.

19          MR. FERNANDEZ:  Just for housekeeping.

20          MR. AZMAN:  We'll go off the record.  We'll

21  go off the record Justin unless you have anything

22  further.

23          MR.  HEILIG:  That's it.  We're off the

24   record.  (Time noted 125).

25

# Exhibit B

12

1    A.  No, I don't know.

2    Q.  So you've not seen any written challenges

3  submitted by O. W. Germany with respect to any security

4  issues as between O. W. Germany and ING Bank?

5         MR.  HEILIG:  Objection to form.

6    A.  Correct.

7    Q.  Let's look at Exhibit number fifteen.

8         MR. HEILIG:  What's the Bates number on

9  that.

10         MR. LETOURNEAU:  Exhibit 15 is Bates-stamped

11  OWG 9542-000054.  It's the notice of assignment letter.

12   Signed by G Petersen of O. W. Bunker and Trading AS.

13     Q.  Do you have that letter in front of you sir?

14     A.  Yes.

15     Q.  Have you ever seen this document before?

16     A.  Just like yesterday or today first time.

17     Q.  So you did not see this document back in December

18   2013?

19     A.  No.

20     Q.  Do you know who Jim Petersen is?

21     A.  Yes.

22     Q.  Who  is Jim Petersen?

23     A.  CEO of O.W. Bunker.

24    Q.  Did you say COO?

25    A.  No.   CEO.

13

1    Q.  CEO? He signed this on behalf of a variety of O.

2    W.  Entities including O.W. Bunker Germany GmbH correct?

3         MR. HEILIG:  Objection to form you can

4    answer if you know.

5    A.  I only see it ^ herein ^ here in the document,

6    yes.

7    Q.  Yes, okay.  Do you have any information or do you

8    know about any instructions that were provided to O. W.

9    Germany in terms of this notice of assignment or any

10   other assignment issues from the head office back in

11   2013 and 2014?

12          MR.  HEILIG:  Objection to form.

13     A.  No, I was not involved in such documentation.

14     Q.  You don't know whether this notice of assignment

15  was sent to any customers correct?

16          MR.  HEILIG:  Same objection.

17     A.  I'm not aware that this document was sent to any

18  customer.

19     Q.  Are you aware of any objections that were filed

20  by O. W. Germany with the head office or ING Bank

21  concerning this notice of assignment.

22          MR.  HEILIG:  Objection to form.

23     A.  No.

24    Q.  .  To form?


25    Q.  Let's go back to the call-off agreement for a few